# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

FERDANAND WHEELINGS and GLENDA
WHEELINGS,

                  Plaintiffs,

   v.

JOSEPH IACUONE, JOHN DOROSH, and
BRIAN GROGAN,

              Defendants.

3:14-cv-00526 (CSH)

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

HAIGHT, Senior District Judge:

In this civil rights action pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs, residents of Derby, Connecticut, claim that Defendants, members of the Derby Police Department, violated their constitutional rights by conducting an unreasonable search and seizure of their home during the early morning hours of July 8, 2013.  Defendants moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, seeking a ruling dismissing Plaintiffs' claims on their merits or alternatively, on the ground of qualified immunity.  Counsel have briefed the issues and this Ruling resolves the motion.

## I.    Background

The following facts are derived from the parties' submissions pursuant to Local Rules 56(a)(1) and (2), uncontroverted deposition testimony,[1] and the exhibits attached to the parties'

---

[1]  Where deposition testimony of the non-movant is unchallenged "[i]n the context of reviewing summary judgment, we must take it to be true." *Bragdon v. Abbott*, 524 U.S. 624, 641 (1998) (citing Fed. R. Civ. P. 56(e)); *see also Fischl v. Armitage*, 128 F.3d 50, 56 (2d Cir. 1997) (holding as improper the district court's credibility assessment and drawing of adverse inferences to determine that the plaintiff may not have been beaten because "[f]or purposes of ruling on the

respective memoranda of law (respectively, "Plfs.' Ex." and "Defs.' Ex."). [Docs. ##17-19]. The facts recounted in this section are undisputed or indisputable.

On July 8, 2013,[2] at 2:48 a.m., police officers Joseph Iacuone, John Dorosh, and Brian Grogan of the Derby Police Department (together, the "Officers" or "Defendants") were dispatched to 18 Garden Place, a free-standing, single-family home in Derby, Connecticut. Defs.' Local Rule 56(a)(1) Statement ("56(a)(1)") ¶ 1; Deposition of Ferdanand Wheelings, dated Feb. 5, 2015 ("FW Tr."), Plfs.' Ex. 1 [Doc. #18-2], at 7:10-16. Their dispatch was in response to a 911 call from non-party Myra Wheelings ("Myra"). 56(a)(1) ¶ 2. Myra and Plaintiff Ferdanand Wheelings, a staff sergeant in the U.S. Army, were divorced in 1994 and together have four children. FW Tr., Plfs.' Ex. 1 [Doc. #18-2], at 8:20-9:22, 13:2-9.

On arrival at the property, the Officers were met by Myra. 56(a)(1) ¶ 3. Myra told the Officers that while she was out of town on a family matter in South Carolina, her husband, Mr. Wheelings, moved a woman into her house. *Id.* This woman was later identified as Plaintiff Glenda Wheelings (then Glenda Martinez) ("Glenda"), the unwanted person that was purportedly the subject of Myra's 911 complaint. *Id.* ¶ 4. Glenda was Mr. Wheelings' then-fiancé, and had moved into 18 Garden Place one week prior to this incident.[3] *Id.* Myra requested that the Officers escort her into the property under the expectation that a conflict might occur were she to enter alone. *Id.* ¶ 5.

---

motion for summary judgment, [non-moving plaintiff's] testimony that he was beaten by the inmates must be accepted as true.").

[2] Although Defendants' Local Rule 56(a)(1) statement indicates that these activities took place on July 7, 2013, this appears to be in error. *See* Defs.' Exs. A, C at 11:17-19, 13:14-16, 14:23-21:14, 23:18-25 [Doc. No. 17-3]; Complaint [Doc. #1] ¶ 7.

[3] The Plaintiffs were then married on August 20, 2013. Deposition of Glenda Wheelings, dated Mar. 24, 2015 ("GW Tr."), Plfs.' Ex. C [Doc. #17-3], at 11:1-2.

-2-

With use of a key that Myra had with her, the Officers and Myra entered the residence.[4]  *Id.*

¶ 6.  Unbeknownst to the Officers, it was not clear that the key belonged to Myra.  FW Tr., Defs.'

Ex. C [Doc. #17-3], at 31:16-20.  Rather, it appears that she may have wrested it from its hiding spot

inside a false rock in the front of the house, where Mr. Wheelings kept a copy for his son's use.  *Id.*

at 31:21-32:21.

Upon entry, the Officers entered into the downstairs hallway with Myra and called out to Mr.

Wheelings.[5]  *Id.* at 59:17-60:3.  Sleeping in the upstairs section of the house were Mr. Wheelings,

Glenda, and two of Glenda's daughters.  *Id.* at 58:18-59:20.  Once they aroused Mr. Wheelings from

his bedroom, the Officers engaged him in a discussion—the Officers from the downstairs hallway

and Mr. Wheelings from the stairwell—telling him that they have an unwanted person report and

that his wife, Myra, says that he has someone upstairs.  *Id.* at 60:9-13.  Mr. Wheelings told the

Officers that, contrary to Myra's protestations, the two were divorced in 1994 and that she does not

reside at the property.  *Id.* at 60:13-19.  Officer Iacoune asked Mr. Wheelings if he could provide

documentation of his divorce from Ms. Wheelings, which he was unable immediately to do.  *Id.* at

60:19-61:3.  Rather, Mr. Wheelings asked the Officers to look up the information on their

computers, which they did not do (the reasons for which are unclear).  *Id.* at 60:21-22.  The Officers

summoned Mr. Wheelings downstairs and ultimately into the downstairs kitchen.  *Id.* at 60:15-61:10.

Once in the kitchen, Officer Iacoune did not permit Mr. Wheelings to move around the residence.

---

[4]  The record before the Court does not clearly indicate whether it was Myra or the
Officers who actually used the key to open the door.

[5]  Plaintiffs also testified that they were woken up thirty minutes earlier by noise being
made inside of their house, presumably by Myra.  FW Tr., Plfs.' Ex. 1 [Doc. #18-2], at 58:21-
59:20, 61:3-5; GW Tr.. Defs.' Ex. C [Doc. 17-3], at 15:16-19.

*Id.* at 61:9-11.   While this occurred, another of the Officers entered the upstairs master bedroom in which Glenda and her daughters were located and told them not to leave the room.  GW Tr., Defs.' Ex. C [Doc. #17-4], at 17:16-18.

Mr. Wheelings and the Officers engaged in further discussion in the kitchen, during which the following exchanges took place:  (a) Officers Stanko and Dodson told Mr. Wheelings that they had documents in which Myra lists 18 Garden Place as her address,[6] FW Tr., Defs.' Ex. C [Doc. #18-2], at 56:4-6, 75:20-21; (b) Mr. Wheelings told the Officers that Myra neither receives mail at 18 Garden Place nor pays any bills with respect to the property, *id.* at 56:17-19; (c) Mr. Wheelings informed the Officers that he had allowed Myra to stay at the property on several occasions following their divorce, but denied that she resided at the property, *id.* at 61:17-19;[7] and (d) Mr. Wheelings told the Officers that he and Myra had entered into a financial agreement the previous month—which Mr. Wheelings showed to the Officers—to assist her and their son's move to South Carolina,[8] FW Tr., Defs.' Ex. B [Doc. #17-3], at 65:12-66:25.[9]

---

[6]  Apparently, Myra had shown the police officers an old marriage license.  GW Tr., Mem. Ex. B [Doc. #17-3], at 19:24-25.

[7]  Mr. Wheelings likewise testified at his deposition that Myra never resided at 18 Garden Place.  FW Tr., Plfs.' Ex. 1 [Doc. # 18-2], at 27:1-7.  Defendants submit credible evidence that this is inaccurate.  *See* Defs.' Ex. F [Doc. #17-3] (July 16, 2013 police report indicating that "Fernando [Wheelings] stated [to the police] that Myra was still on the lease to 18 Garden Place and still had a key to the residence"); Defs.' Ex. I [Doc. #17-3] (March 5, 2013 police incident report listing 18 Garden Place as Myra's address); Defs.' Ex. H [Doc. #17-3] (August 20, 2009 social security benefits form filled out by Mr. Wheelings indicating that Myra is his spouse and resides at 18 Garden Place).  Nonetheless, both Plaintiffs' provided uncontroverted testimony that Myra did not have any property at the residence on the night in question.  FW Tr., Defs.' Ex. B [Doc. #17-3], at 73:15-17; GW Tr., Defs.' Ex. C [Doc. #17-4], at 13:24-14:3.

[8]  It is not entirely clear whose position this agreement supports.  It states that "Miss Myra E. Fields Wheelings . . . will leave Connecticut by the 22nd of June 2013 to find an apartment *so the house at 18 Garden Place Derby, CT 06418 can be turned over to the landlord by 1 July*

-4-

Although the Officers told Mr. Wheelings not to leave the kitchen, they permitted Myra to move freely around the house, escorted by Officer Dorosh. *Id.* at 61:12-14. The Officers allowed Myra "to stroll through [the] house and do whatever it is that she so wanted to do." *Id.* This included her going upstairs, "interrogat[ing]" Glenda—whom she had never met—and verbally assaulting Glenda's 16 year old daughter. *Id.* at 61:14-17; GW Tr., Defs.' Ex. C [Doc. #17-3], at 11:17-18, 17:19-23. During this time, Myra told the Officers that everything in the house belonged to her. GW Tr., Defs.' Ex. C [Doc. #17-3], at 17:2-7. In addition, Myra entered several of the upstairs rooms, opened drawers and threw the Plaintiffs' belongings on the floor. *Id.* at 18:13-14. Myra's erratic behavior did not go unnoticed by Officer Dorosh, who said to her: "Miss, you've got a problem. You should be on Jerry Springer. One minute you want to cry, next minute you're laughing. What's going? What's going on with you?" FW Tr., Defs.' Ex. C [Doc. #18-2], at 74:19-22.

Myra then returned to the kitchen, where Mr. Wheelings and Officer Iacuone were conversing. *Id.* at 74:24. When it appeared that Mr. Wheelings and Myra might engage in a physical confrontation, Officer Iacuone intervened and told Mr. Wheelings that he "probably need[s] to get ready to go to a hotel." *Id.* at 74:24-75:6. Mr. Wheelings rejected this offer. *Id.* at 75:8. Officer Iacuone then announced that "This man isn't going anywhere, the lady upstairs is not going

---

*2013 and end the rental contract.*" Plfs.' Ex. D [Doc. #17-3] (emphasis added). The emphasized section indicates that up to at least June 22, 2013, Myra had possessions within 18 Garden Place that required removal. Although this may contradict Myra's claim that she lived there as of July 8, 2013, it also contradicts Plaintiffs' current position that Myra "never resided at 18 Garden Place prior to the events in question in this litigation." 56(a)(2), at p. 4 ¶ 6.

[9]  The record also establishes that Myra had a South Carolina driver's license, FW Tr., Plfs.' Ex. 1 [Doc 18-2], at 13-14, but it does not establish that the Officers were aware of such.

anywhere.  And, Lady, you don't have to go anywhere." *Id.* at 75:13-15.  Mr. Wheelings then pleaded with Officer Iacuone to remove Myra from the house, referring to her as an unwanted intruder. *Id.* at 75:16-25.  Despite telling Mr. Wheelings that they could not extricate Myra from the house because it was "a civil matter," the Officers made some attempt to remove her from the house, which she resisted.  FW Tr., Plfs.' Ex. 1 [Doc. #18-2], at 75:25-76:3.

The Officers made no further attempt to remove Myra from the house.  Instead, they exited the property and engaged in a conversation amongst themselves on the sidewalk adjacent to 18 Garden Place. *Id.* at 76:3-9.  With the Officers gone from the home, Myra "started going through the house, knocking things off the shelves, breaking stuff." *Id.* at 76:9-10; *see also* GW Tr., Defs.' Ex. C [Doc. #17-3], at 21:8-10.  In reaction, Mr. Wheelings went to the porch of the residence to inform the officers that Myra was destroying his property, at which point Officer Dorosh put his hands on his weapon and said "If you don't get back in that house, I'm going to arrest you."  FW Tr., Plfs.' Ex. 1 [Doc. #18-2], at 76:12-19.  Mr. Wheelings obliged, returned inside the house and the Officers then left the scene. *Id.* at 76:19-77:4.

It is undisputed that throughout the Officers' presence in the residence, they did no searching of the property themselves, nor did they seize any property from the premises.  56(a)(1) ¶ 16.  The Officers were at the scene for approximately 45 minutes.  GW Tr., Defs.' Ex. C [Doc. #17-3], at 29:13.

Following the Officers' departure, Mr. Wheelings, Glenda, and Glenda's two daughters locked themselves in the master bedroom.  FW Tr., Plfs.' Ex. 1 [Doc. #18-2], at 76:22-77:2.  Myra tried forcefully to enter the bedroom multiple times throughout the night without success, at one point with a knife in her hand. *Id.* at 77:4-18.  When Mr. Wheelings saw that Myra was still in the

-6-

residence in the morning, he told Glenda and her two daughters to leave the house and not return while he went to the courthouse to address the situation. *Id.* at 77:19-78:6.

On July 10, 2013, Mr. Wheelings sought a restraining order against Myra at the Connecticut Superior Court, in Derby, which was denied. 56(a)(1) ¶ 18. On July 12, 2013, Myra sought her own restraining order at the same court, which was granted for a period of 90 days and pursuant to which Mr. Wheelings was prohibited from entering 18 Garden Place. 56(a)(1) ¶¶ 18-19; GW Tr., Defs.' Ex. C [Doc. 17-3], at 32:22-23. Myra remained at 18 Garden Place throughout most of the restraining order's operative period, ultimately leaving the premises on September 1, 2013. FW Tr., Plfs.' Ex. 1 [Doc. #18-2], at 84:22-24. However, on or about July 27, 2013, Mr. Wheelings was allowed a court-authorized and police-supervised eight-hour period to retrieve his belongings from the residence. 56(a)(1) ¶ 20. During that visit, the Plaintiffs discovered that nearly all of their property was either intentionally destroyed or missing. GW Tr., Plfs.' Ex. C [Doc. 17-3], at 30:1 (Myra "emptied the house").

Plaintiffs never instituted any action against Myra in relation to her above-described behavior. 56(a)(1) ¶ 21. Instead, Plaintiffs commenced this action on April 21, 2014, by filing a complaint against Officers Iacuone, Dorosh, and Grogan in their individual capacities. Plaintiffs alleged that, by their actions described above, "the defendants violated the rights of the plaintiffs to be free from warrantless and unreasonable search and seizure, and from deprivation of property without either procedural or substantive due process of law, all in violation of the Fourth and Fourteenth Amendments to the United States Constitution as enforced through Sections 1983 and 1988 of Title 42 of the United States Code." Complaint [Doc. #1] ¶ 15.

## II.      Standard of Review

A motion for summary judgment may be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

In assessing a motion for summary judgment, a Court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013).

## III.     Liability Under 42 U.S.C. § 1983

Plaintiffs charge the Officers with deprivation of their right to be free from unreasonable searches, as well as deprivation of property without due process, under the Fourth and Fourteenth Amendments in violation of 42 U.S.C. § 1983.  Section 1983 does not itself provide a source of substantive rights, but instead provides the mechanism by which a plaintiff may seek vindication of federal rights conferred elsewhere.  *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).  "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a federal right."  *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999).  The Fourth Amendment, on which Plaintiffs' section 1983 claim is principally predicated, reads as follows:

> The rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[10]

---

[10]   The Fourth Amendment's search and seizure provisions are applicable to the states via the Fourteenth Amendment.  *See Tenenbaum v. Williams*, 193 F.3d 581, 602 n. 14 (1999).

-8-

U.S. Const. amend. IV.  Plaintiffs claim that the Officers violated their right against unreasonable searches and seizures in violation of the Fourth Amendment by entering their residence, and, once inside, by permitting Myra to wander through their home.  Plaintiffs also claim that the Officers deprived them of "property[] without due process of law" in violation of the Fourteenth Amendment.  U.S. Const. amend. XIV.

The Officers have moved for summary judgment dismissing Plaintiffs' claims, arguing that the Officers conducted no Fourth Amendment "search," and that, if so, it was lawful pursuant to Myra's consent—either actual or apparent.  Defendants further argue that Plaintiffs have not demonstrated any deprivation of their property by the State, a prerequisite for liability under the due process clause.  Finally, Defendants argue that, in any event, they are entitled to qualified immunity.

## IV.    Fourth Amendment Claim

### A.    A Fourth Amendment "Search"

Defendants aim to avoid liability by asserting as a threshold matter that their actions do not constitute a "search" and thus are entirely outside the Fourth Amendment's purview.  Specifically, Defendants posit that "[t]here is no evidence that the defendants inspected or searched the house in any way or that they did anything more than enter the house to inquire as to the situation" to which they were summoned.  Defs.' Mem. [Doc. #17-1], at 7.  Moreover, it is undisputed that "the defendants did not search or seize any property at the premises." Defs.' Resp. [Doc. #19], at 2 (citing Plaintiffs' Local Rule 56(a)(2) submission).

Nevertheless, the Officers' actions constitute a "search" as the term is used in the Fourth Amendment.  A "Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. U.S.*, 533 U.S. 27, 33 (2001).

Respect for the expectation of privacy within one's home is at the core of the Fourth Amendment, which embodies the "now famous observation that 'the house of every one is to him as his castle and fortress.'" *Wilson v. Layne*, 526 U.S. 603, 609-10 (1999) (quoting *Semayne's Case*, 77 Eng. Rep. 194, 195 (1604)); *see also U.S. v. Reed*, 572 F.2d 412, 422 (2d Cir. 1978) ("one's reasonable expectation of privacy in the home is entitled to a unique sensitivity from federal courts.").

By focusing exclusively on the subjective expectations of those effected by government action, the Fourth Amendment is not concerned with the government actor's motivation. *See Bond v. U.S.*, 529 U.S. 334, 338 n.2 (2000) ("the subjective intent of the law enforcement officer is irrelevant in determining whether that officer's action violates the Fourth Amendment . . . the issue is not [the agent's] state of mind, but the objective effect of his actions."); *see also U.S. v. Maple*, 348 F.3d 260, 262 (D.C. Cir. 2003) (a police officer's opening of a closed compartment in defendant's car solely to secure defendant's cell phone from public view is a Fourth Amendment search because "any deliberate government intrusion into a closed space—opening a door or a closed compartment—is a search regardless of the reasons for the intrusion.").

Accordingly, that the Officers may have entered the Plaintiffs' residence solely to forestall a potential domestic disturbance is of no moment. Nor is the fact that the Officers may have effected no "search" or "seizure" as those terms are colloquially used. Any breach into a citizen's "castle" is one that implicates the restrictions against searches codified in the Fourth Amendment. *See Kyllo*, 533 U.S. at 27 ("any physical invasion of the structure of the home, 'by even a fraction of an inch,' [i]s too much"). By entering the Plaintiffs' residence in the early morning hours of July 8, 2013, the Officers interrupted the Plaintiffs' reasonable expectation of privacy in their home and thereby conducted a warrantless Fourth Amendment search.

-10-

### B.        Consent

Defendants next argue that any search of Plaintiffs' residence was not unreasonable—and thus not violative of the Fourth Amendment—because the Officers had consent to enter the residence.  Although a warrantless search of a home is "presumptively unreasonable," *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006), a warrantless search conducted pursuant to authorized consent does not implicate the Fourth Amendment, *U.S. v. Trzaska*, 859 F.2d 1118, 1120 (2d Cir. 1988).   Such consent must come from an individual with "common authority over [the] premises sought to be inspected" and "is valid as against the absent, nonconsenting person with whom that authority is shared."  *Id.* (citing *Matlock v. U.S.*, 415 U.S. 164, 170-71 (1974)).  As the Fourth Amendment only prohibits *unreasonable* government action, it is not "violated when officers enter [a home] without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990).

It is undisputed that Myra consented to the Officers' entry into the Plaintiffs' residence.  56(a)(1) ¶¶ 3, 5, 6.  As such, the Plaintiffs' constitutional rights were not infringed if Myra had sufficient consent authority over 18 Garden Place (*i.e.*, she had actual authority to provide consent), or if it was reasonable for the Officers to believe that she had such authority (*i.e.*, she had apparent authority to provide consent).

### 1.        Actual Authority to Provide Consent

An individual has authority to consent to a search where they have "access to the area searched," and either: "(a) common authority over the area, (b) a substantial interest in the area; or (c) permission to gain access to the area." *Moore v. Andreno*, 505 F.3d 203, 209 (2d Cir. 2007)

(citing the rule announced in *Matlock*, 415 U.S. at 165-66 (1974)).

Here, the access element is satisfied because Myra had access to a key to the premises. *See Moore*, 505 F.3d at 210 (2007) (holding that while "access" has not been specifically delimited, "we have found the access requirement to be satisfied when the party who consented to the search had a key to the searched area" (citing *U.S. v. Buettner-Janusch*, 646 F.2d 759, 765 (2d Cir. 1981)); *see also U.S. v. Stone*, 2007 WL 2727532, at *4 (D. Conn. Sept. 18, 2007) (access prong satisfied where "[t]here was no evidence of forced entry, and [the consenting third-party] retained a key to the house").

Defendants must therefore be able to show that Myra had either a common authority over, a substantial interest in, or permission to access 18 Garden Place. While the substantial interest prong has gone largely undefined in the Second Circuit, the Court of Appeals has held that it should not be defined "in terms of a property interest alone," especially, where, as here, "the property interest itself was purely speculative." *Moore*, 505 F.3d at 211. Further, the Court accepts as true Plaintiffs' position that they did not grant Myra permission to enter the residence.

As such, our inquiry focuses on whether Myra had "common authority" over 18 Garden Place. The Second Circuit has identified a number of factors relevant to whether a third-party has authority over a property such that they can provide consent to a Fourth Amendment search:

> (1) possession of a key to the premises; (2) a person's admission that she lives at the residence in question; (3) possession of a driver's license listing the residence as the driver's legal address; (4) receiving mail and bills at the residence; (5) keeping clothing at the residence; (6) having one's children reside at that address; (7) keeping personal belongings such as a diary or a pet at that residence; (8) performing household chores at that residence; (9) being on the lease for the premises and/or paying rent; and (10) being allowed into the residence when the owner is not present.

-12-

*Moore*, 506 F.2d at 203 n.6 (citing *U.S. v. Groves*, 470 F.3d 311, 319 (7th Cir. 2006)); *see also*

*U.S. v. Thomas*, 2015 WL 164075, at *5 (D. Conn. Jan. 13, 2015) (Chatigny, J.).

Certain of these factors indicate that Myra had some authority over 18 Garden Place.  The
Plaintiffs do not dispute that Mr. Wheelings permitted Myra to stay at the residence at certain times,
nor do they dispute that certain of Myra's children resided there.[11]  However, certain factors indicate
that Myra did not have such authority.  The record shows that Myra did not receive mail or bills at
the residence, did not have any property at the residence, and carried a South Carolina driver's
license.  Moreover, a number of the significant factors identified in *Moore* are in dispute at this stage
of the litigation.  The record does not make indisputably clear: (a) whether Myra was on the rental
lease for 18 Garden Place, *see* 56(a)(1) ¶ 17, 56(a)(2) ¶ 17; (b) whether Myra ever resided at 18
Garden Place, *see*, *supra* note 7; or (c) whether Myra had possession of a key to the premises, or,
rather, just knew how to access the Plaintiffs' hidden key.

Given this context, the Court holds that factual questions preclude a summary judgment
determination that Myra had actual authority to provide consent to a search of 18 Garden Place.
Such a result is the necessary outcome of the fact-intensive inquiry of a common authority analysis,
*see generally Georgia v. Randolph*, 547 U.S. 103, 112 (2006), and that the Court must resolve all
factual ambiguities in favor of the Plaintiffs at this stage.

### 2.    Apparent Authority to Provide Consent

Resolving whether Myra had actual authority to consent to a search of the Plaintiffs'

---

[11]  Moreover, the fact that the Connecticut Superior Court chose to grant Myra a
restraining order that presumably permitted her access to 18 Garden Place—while expressly
excluding the Plaintiffs from same—cuts against Plaintiffs' position that Myra had no authority
over the residence.  Nevertheless, the details of that restraining order are not part of the record
and the Court makes no statement as to its probative value to the question at hand.

residence does not dispose of Defendants' motion.   A search may be reasonable despite being initiated pursuant to a misapprehended fact if the misapprehension was itself reasonable.   This reasoning applies to—and protects—incorrect yet reasonable determinations that a third-party has provided authorized consent to search someone else's home.   *Rodriguez,* 497 U.S. at 186 (when confronted with a question regarding authorized consent to search a premises "all the Fourth Amendment requires is that [the government agents] answer it reasonably").   However, an officer may not blindly rely on a third-party's representation as to its consent authority—"the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." *Id.* at 188.

Plaintiffs assess the Officers' determination as to Myra's consent authority in two stages. *First*, they argue that it was unreasonable to believe that Myra had the authority to consent to the initial entry into 18 Garden Place.   *Second*, they argue that it was "more unreasonable" to adhere to that determination upon witnessing the scene inside of the residence.   The Court addresses these arguments in turn.

### a.   The Officers' Initial Entry into Plaintiffs' Residence

Plaintiffs argue first that the Officers' initial entry into the house was unreasonable because on arrival at 18 Garden Place, it was unreasonable to believe that Myra had authority to enter the residence.   They claim that Myra's "sole basis for asserting her authority to consent to [the Officers'] entry was her possession of a key," and that "[s]he produced no identification establishing her residence in the premises and no evidence of her identity at all."   Plfs.' Opp. [Doc. #18], at 7-8.

*First*, Plaintiffs' claim that the key was the Officers' "sole basis" for determining consent

authority is contradicted by both Plaintiffs' deposition testimony.[12]  Mr. Wheelings testified that Officers Stanko and Dodson informed him "that they have documents of [Myra] listing 18 Garden Place as her residence."  FW Tr., Plfs.' Ex. 1 [Doc. #18-2], at 56:4-6.  Glenda also testified that the Officers told Mr. Wheelings that Myra had presented them with an old marriage license purportedly establishing her nuptials to Mr. Wheelings.  GW Tr., Defs.' Ex. C [Doc. #17-3], at 19:24-25.

*Second*, and more fundamentally, Plaintiffs' conception of the standard of reasonableness of a police officer's consent determination is not in accord with the law.  In *Rodriguez*, the seminal case establishing the mistaken consent doctrine, the third-party demonstrated her authority to provide consent simply by referring to the premises in question as "our" apartment, claiming that she had property in the residence, and unlocking the door with a key in her possession.  497 U.S. at 179. Moreover, it was "unclear whether she indicated that she currently lived at the apartment, or only that she used to live there."  *Id.*  In addition, that third-party summoned the police officers to another residence; the officers only traveled with the third-party to the premises in question under her assertion that her alleged assaulter resided at that apartment.

Since *Rodriguez*, the Second Circuit has only had one occasion to rule that police officers were unreasonable in their determination that a third-party gave proper consent to a search of another's premises.  *See Moore v. Andreno*, 505 F.3d 203 (2d Cir. 2007).  In *Moore*, the police officers searched the defendant's study on the consent of Ruth Sines, the defendant's "on-again, off-again lover[]."  *Id.* at 205.  Although Sines lived with the defendant at his home from time-to-time, and had a key to his house, the defendant expressly forbade her from entering the study and "always

---

[12]  Sworn deposition testimony "[can]not later be contradicted for the purpose of creating an issue of fact."  *Miller v. Int'l Telephone and Telegraph Corp.*, 755 F.2d 20, 24 (2d Cir. 1985).

kept it locked." *Id.* When Sines summoned the police to the defendant's home, she expressly informed the officers that the defendant did not allow her in the study and that she had forcefully removed the locks that he used to secure the study's door. *Id.* Nevertheless, the police searched the study pursuant to Sines' consent, a decision the Second Circuit held to be unreasonable and therefore in violation of the defendant's Fourth Amendment rights. *Id.* at 208-213.

The Officers here had even more reason to believe that Myra had consent authority than did the officers in *Rodriguez*, and their actions are a far cry from those at issue in *Moore*. Just like the third-party in *Rodriguez*, Myra told the police that it was her residence and unlocked the door with a key that she had. Moreover, the sole basis for Myra's call to the police was to summon them to the property in question due to an allegedly unwanted person within what she claimed was her residence. On arrival at that location, the Officers were met by Myra, who continued her uncontested assertion that the residence was hers, claimed that her husband and children were inside, and successfully used a key to unlock the door. With this context in mind, it was reasonable for the Officers to believe that Myra had the authority to enter the Plaintiffs' residence.

### b.   The Officers' Actions Once Inside Plaintiffs' Residence

Plaintiffs raise a second argument as to the Officers' actions on the night in question. In essence, they argue that even if the Officers' initial assessment of Myra's consent authority were reasonable, it became unreasonable to adhere to that assessment upon entry into the house. It was unreasonable to believe that Myra had consent to enter the Plaintiffs' home—the argument supposedly goes—when upon entry Mr. Wheelings immediately "expressed his surprise and outrage" at Myra's occupancy claims and told the Officers that the two had been divorced for 19 years and that his new spouse and children were asleep upstairs.

-16-

Courts in the Second Circuit have not directly answered whether—and, if so, how—a police officer's reasonable determination as to a third-party's consent authority becomes unreasonable when subsequent events during the search cast doubt on that determination.  The Sixth Circuit has, and holds that "[w]hen a situation starts as unambiguous but subsequent discoveries create ambiguity, any apparent authority [to consent to a warrantless search] evaporates."  *U.S. v. Purcell*, 526 F.3d 953, 964 (6th Cir. 2008).  This doctrinal analysis is in line with analogous thinking in the Second Circuit.  *See Moore v. Vega*, 371 F.3d 110, 118 (2d Cir. 2004) (police officers' "reasonable belief that [they were in the correct residence] . . . extended until they were presented with convincing evidence that the information they had relied upon was incorrect").

The facts of *Purcell* are illustrative.  There, Yolande Crist, the girlfriend of the defendant, consented to an initial sweep search of a hotel room in which she and the defendant resided.  Following that initial sweep, Crist consented to a further search of a duffel bag that she identified as hers.  The officers found marijuana upon a search of that bag, but also found that the bag was otherwise filled with men's clothing, a strong indication that the bag did not belong to Crist, a female.  Despite that fact, the officers relied on her initial consent to search another bag in the room, which contained an illicit firearm.  The Sixth Circuit held that the search of the bag with marijuana was reasonable because Crist had apparent authority to consent to its search.  However, the Court further held that the men's clothing inside of that bag created an ambiguity as to Crist's consent authority.  That being the case, the officers' failure to conduct any further inquiry as to Crist's consent authority made searches of other bags in that hotel room unreasonable.  "Crist's apparent authority, which justified the search of the first bag, dissipated upon the discovery of the men's clothing and was not reestablished, leaving Crist without apparent authority to consent to the search of the

backpack." *Id.* at 964 (holding that a reasonable officer would have further questioned Sines following the search of the first bag).

The Sixth Circuit's rationale in *Purcell* frames the two relevant inquiries here: (a) whether an ambiguity was created as to Myra's consent authority with respect to 18 Garden Place following the initial entry, and (b) if so, whether the Officers thereafter conducted a sufficient inquiry to test that initial determination.

There is at least a genuine issue of material fact as to whether an ambiguity was created as to Myra's consent authority upon entry into the residence. Defendants nearly admit as much by acknowledging that the reason the Officers did not force either party to leave the residence was "the *disputed status* of the parties." 56(a)(1) ¶ 15 (emphasis added). Moreover, the nature of the Officers' interaction with Mr. Wheelings should have created doubt as to whether Myra had proper consent authority. Myra made an emergency call to the police regarding an unwanted person inside her residence, but, upon entry, the Officers were met with a peaceful home and a clearly disturbed resident expressing shock that the entering woman was claiming she resided there. That resident informed the Officers that the couple had been divorced for nearly two decades, that his current wife and her kids were sleeping upstairs, and continually denied the third-party's occupancy claims. Moreover, while this occurred, the third-party was engaging in erratic behavior. These facts should have raised an ambiguity as to Myra's authority to consent to a search of the Plaintiffs' residence.

However, that does not end the inquiry. Unlike the officers in *Purcell*, the Officers here understood this ambiguity and the concomitant need for further inquiry. Specifically, they asked Mr. Wheelings whether he had evidence of the parties' divorce, given that Myra had presented them with a marriage license purportedly establishing her marriage to Mr. Wheelings. They spoke with Myra,

-18-

who continued to say that she lived in the residence and informed them that all of the possessions in the house were hers. They listened to Mr. Wheelings explain that he had helped Myra move her possessions to South Carolina just a few weeks earlier, and they reviewed the parties' financial agreement governing that move.[13]   Following this inquiry, and without ever conducting an actual independent search of the residence, the Officers left the property after a total of 45 minutes.  As such, not only did the Officers conduct a reasonable inquiry, they, unlike the officers in *Purcell*, terminated their search soon after being presented with ambiguity.  In fact, it appears that nearly all of the Officers' behavior within 18 Garden Place was aimed at resolving the ambiguous and complicated situation with which they were confronted.

The Court therefore concludes that the Officers' actions during their 45 minute stay inside of the Plaintiffs' residence do not constitute an unreasonable search and seizure in violation of Plaintiffs' Fourth Amendment rights.  The Officers' initial entry into the house was proper under the consent exception to the Fourth Amendment's proscription against warrantless searches.  When faced with ambiguity as to the propriety of that consent, the Officers were permitted a certain flexibility to remain briefly in the residence to conduct an inquiry to determine if their presence was in fact authorized or otherwise warranted.  Following that inquiry, they terminated the search and left the residence.  On these facts, it cannot be shown that this was an unreasonable search or seizure in violation of the Fourth Amendment.

## V.    Due Process Claims

In their complaint, Plaintiffs conclusorily allege that "the defendants violated the rights of plaintiffs to be free . . . from deprivation of property without either procedural or substantive due

---

[13] As discussed, *supra* n.8, this agreement likely created more ambiguity rather than less.

process of law, [] in violation of the . . . Fourteenth Amendment." Complaint [Doc. #1] ¶ 15.[14] [15] The Fourteenth Amendment provides, *inter alia*, that no "state [shall] deprive any person of life, liberty, or property, without due process of law." Due process is our citizens' stalwart against arbitrary government action, and is manifested in one of two ways. *First*, substantive due process protects against government's "exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998). *Second*, procedural due process protects against "the denial of fundamental procedural fairness." *Id.* In short, substantive due process governs what life, liberty, or property the government may take and procedural due process governs how it may take it.

Although Plaintiffs altogether fail to flesh out any due process-based theory of recovery, any theory they would proffer would fail under either due process component. This is so because Plaintiffs cannot make the threshold showing required for either claim: deprivation by the State.

*First*, Plaintiffs' admission that the Defendants did not seize any of their property necessarily precludes their due process claims. Plaintiffs simply have not shown that the Defendants deprived them of any property.

*Second*, to the extent Plaintiffs' due process claims are premised on Defendants' alleged failure to forestall Myra's destructive actions, it fails. Contrary to Plaintiffs' allegations, there is no

---

[14] Plaintiffs claim that the Defendants waived a determination as to their due process claims by failing to address them in their summary judgment motion. Plaintiffs are mistaken. Defendants motion expressly "move[s] for Summary Judgment as to *the entirety* of plaintiff's [*sic*] Complaint," thereby including any due process claims within. [Doc. ##17, 17-1].

[15] Plaintiffs' complaint and opposition papers make certain statements intimating that due to the Officers' alleged confinement of the Plaintiffs, they may have a due process claim under a theory of deprivation of liberty. The Court makes no statement as to that claim as the Plaintiffs expressly limited this claim as to a property deprivation theory. *See* Complaint [Doc. #1] ¶ 15.

general "right[] of [citizens] to be free . . . from deprivation of property without [due process]." Complaint [Doc. #1] ¶ 15.   Rather, the due process clause only serves to limit *the State* from interfering with private property interests—it in no way creates an "affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Deshaney v. Winnebago Cnty Dept. of Social Services*, 489 U.S. 189, 195-96 (1989) ("nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors . . . even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual"). Although Myra may have deprived the Plaintiffs of their property, the State did not.  Plaintiffs had no constitutionally protected right to the State's protection against Myra's actions.  Their due process claims fail.[16]

## VI.   Qualified Immunity

Having determined that the Plaintiffs have not established an actionable claim against the Defendants, it is unnecessary to assess Defendants' alternative argument that they are shielded from liability through the privilege of qualified immunity.  *See*, *e.g.*, *Weyant v. Okst*, 101 F.3d 845, 857 (2d Cir. 1996) (public officials cannot be subject to liability if "their conduct does not violate clearly established constitutional rights").  Plaintiffs have failed to show that the Officers violated their

---

[16]  Plaintiffs' Fourteenth Amendment substantive due process claim also fails for the independent reason that a plaintiff may not bring such a claim when its underlying allegations relate solely to conduct governed by the Fourth Amendment. *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) (affirming dismissal of plaintiff's substantive due process claim alleging a pretrial deprivation of liberty, holding that "[w]here a particular Amendment," there also the Fourth Amendment, "'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

constitutional rights, and thereby there is nothing for which the Officers require immunity.

**VII.    Conclusion**

For the reasons stated above, the Defendants' motion for summary judgment [Doc. #17] is

GRANTED.   The Clerk is directed to enter judgment for the Defendants, dismissing this action with

prejudice, and to close the file.

It is SO ORDERED.


Dated: New Haven, Connecticut
          September 10, 2015

                                                    /s/ Charles S. Haight, Jr.
                                                    Charles S. Haight, Jr.
                                                    Senior United States District Judge